F I L E D
United States Court of Appeals
Tenth Circuit

MAY 12 1998

PATRICK FISHER
Clerk

PUBLISH

UNITED STATES COURT OF APPEALS

TENTH CIRCUIT

JERILYN ZINN,

      Plaintiff-Appellant,

vs.

DAVID MCKUNE, in his individual and
official capacity; STATE OF KANSAS
DEPARTMENT OF CORRECTIONS;
FRITZ YOUNG,

      Defendants-Appellees.

No. 97-3007

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS
(D.C. No. 95-CV-2429)

Jane McQueeny, Benson and Associates (Bert Braud of the Popham Law Firm with her
on the brief), Kansas City, Missouri, for Plaintiff-Appellant

Linden G. Appel (Edward F. Britton, Jr. and Lisa A. Mendoza with him on the brief),
Kansas Department of Corrections, Topeka, Kansas, for Defendants-Appellees

Before **KELLY**, **BARRETT**, and **BRISCOE**, Circuit Judges.

**KELLY**, Circuit Judge.

      Plaintiff-appellant Jerilyn Zinn appeals from the district court's grant of summary

judgment in favor of defendant-appellees David McKune, Fritz Young and the Kansas Department of Corrections (Department).[1]  See Zinn v. McKune, 949 F. Supp. 1530 (D. Kan. 1996).  Relying on Lambertsen v. Utah Dept. of Corrections, 79 F.3d 1024 (10th Cir. 1996), the district court determined that Ms. Zinn was not an employee of the Department and dismissed her retaliation claims brought under Title VII of the 1964 Civil Rights Act and Kansas's common-law "whistle-blower" retaliatory discharge doctrine. See Zinn, 949 F. Supp. at 1534-38.  We have jurisdiction pursuant to 28 U.S.C. § 1291, and we affirm.

## Background

Prison Health Services (PHS) provided medical services to the Osawatomie Correctional Facility, a Kansas state prison administered by the Department of Corrections, pursuant to a written contract.  In 1992, Jerilyn Zinn was hired by PHS as a correctional nurse assigned to the prison clinic at Osawatomie.  From 1992 to 1995, Ms. Zinn served as the clinic's Charge Nurse, and as her job title implies, Ms. Zinn was responsible for the day-to-day operation of the clinic.

The contract between PHS and the Department expressly provided that both PHS and its employees were independent contractors, and explicitly negated the existence of

---

[1]References to the Department should be read to include the two named individual defendants, Fritz Young and David McKune.

any agency, employment or servant relationship between PHS and the Department of Corrections. See I Joint App. at 75. Accordingly, PHS exercised control over the hiring, firing, wages and benefits of PHS personnel like Ms. Zinn. The agreement also required that PHS personnel assigned to one of the Department's prison facilities had to "comply with all applicable rules and regulations, Internal Management Policies and Procedures, and general orders of the Department . . . respecting operations and activities in and about property occupied by the Department," I Joint App. at 80, including the Department of Corrections' Employee Rules of Conduct/Conditions of Employment. See id.; I Joint App. at 99-108. According to the Policy Statement which precedes them, the Rules of Conduct were promulgated to "provid[e] a productive and efficient work environment free of behaviors that are either violent, threatening, disruptive, harassing, [or] dishonest . . . ." I Joint App. at 99. To that end, the Rules establish operational standards relating to penological security concerns, including limitations on contact with inmates and their families, dress and conduct requirements, and regulation of the use of state property. See id. at 99-108. Moreover, in recognition of "the sensitive nature of penal institutions," I Joint App. at 62, the contract grants the Department discretion to request removal of PHS personnel assigned to work in a Department prison facility under the contract. Id. If the Department's concerns about a PHS employee are not resolved, PHS agrees to remove the employee from the facility. Id.

Phyllis Warder, who was Ms. Zinn's immediate supervisor and a Department

3

employee, evaluated Ms. Zinn's management of the clinic as it related to the delivery of health care services in the clinic. Ms. Warder, however, was not assigned to the Osawatomie facility and had little day-to-day contact with Ms. Zinn. Fritz Young, a Department employee, also supervised Ms. Zinn's activities within the Osawatomie facility and her management of the clinic to the extent they implicated safety and security concerns within the prison. See II Joint App. at 365-68, 395-96. Department employees also conducted audits of Ms. Zinn's preparation of inmate medical records to ensure they were prepared according to the Department's specifications, as required by the contract between PHS and the Department. See I Joint App. at 79-80; II Joint App. at 333-34, 363-64.

Ms. Zinn filed an initial charge of discrimination with the Department in December 1994, alleging, among other things, that a male corrections officer verbally abused her. The Department investigated those allegations and found them to be without merit. In January 1995, several incident reports were filed against Ms. Zinn detailing allegedly improper contact with inmates. On January 19, 1995, Ms. Zinn provided Captain Dan Castello with information relating to the use of state supplies by inmates to produce gifts for former and current state employees. See II Joint App. at 495. Captain Castello's investigation of the incident implicated Fritz Young, who was thereafter disciplined for misuse of state property and for failing to address Ms. Zinn's complaints in an aggressive manner. See II Joint App. at 497-98. In early February, Deputy Warden

4

Rudy Stupar requested that Mark Boyd, Health Services Administrator of PHS, reassign Ms. Zinn, citing four specific examples of "inappropriate behavior." II Joint App. at 445. Ms. Zinn was denied access to the Osawatomie facility on February 21, 1995. See II Joint App. at 446. PHS subsequently offered Ms. Zinn reassignment to other prison clinics in Wyandotte or Lansing, but Ms. Zinn accepted neither offer because she was physically unable to perform the duties of either position. PHS placed Ms. Zinn on disability leave without pay in March 1995.

Ms. Zinn filed a charge of discrimination with the Kansas Human Rights Commission against the Department as well as PHS alleging violations of the Americans with Disabilities Act (ADA), the Age Discrimination in Employment Act (ADEA), and sex discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964. See I Joint App. at 21. After receiving her right to sue letter, Ms. Zinn filed suit against all named parties to this appeal as well as PHS, with whom she settled. See I Joint App. at 1-2. The remaining defendants sought summary judgment against Ms. Zinn, arguing, among other things, that the Department was not Ms. Zinn's employer. See I Joint App. at 267-309. The district court granted defendants' motion, holding that Ms. Zinn presented "no evidence from which a trier of fact could conclude that [Ms. Zinn] was an employee of the KDC for Title VII purposes." II Joint App. at 591. Similarly, the district court dismissed Ms. Zinn's state law whistle-blower retaliation claim, noting that Ms. Zinn had not established that the Department had the power to terminate her and had not

established a causal link between her whistle-blowing and her termination. See II Joint App. at 598-99. Ms. Zinn appealed.

Discussion

We review the district court's grant of summary judgment de novo and apply the same legal standard as the district court. See Wolf v. Prudential Ins. Co., 50 F.3d 793, 796 (10th Cir. 1995). Summary judgment is appropriate if there is "no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). We examine the factual record and the reasonable inferences which may be drawn from it in the light most favorable to Ms. Zinn. See Universal Money Centers v. AT&T Co., 22 F.3d 1527, 1529 (10th Cir.), cert. denied, 513 U.S. 1052 (1994).

Under Title VII, Ms. Zinn's employment status with the Department is "both a jurisdictional question and an aspect of [her] substantive claim" of retaliation. Wheeler v. Hurdman, 825 F.2d 257, 259 (10th Cir.), cert. denied, 484 U.S. 986 (1987). In other words, Ms. Zinn must establish, for jurisdictional purposes, that the Department falls within the statutory definition of "employer" provided in 42 U.S.C. § 2000e(b)[2] and that she is personally entitled to relief under the statute because she has an employment

_____

[2]Title VII defines "employer" as "a person . . . who has fifteen or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year, and any agent of such a person . . . ." 42 U.S.C. § 2000e(b).

relationship with the Department as required by 42 U.S.C. § 2000e(f).[3]  See Deal v. State

Farm Co. Mut. Ins. Co., 5 F.3d 117, 118 n.2 (5th Cir. 1993).  The parties apparently do

not dispute that the Department falls within the statute; thus, the sole issue presented is

whether Ms. Zinn is an employee of the Department.

We agree with the parties that Lambertsen v. Utah Dept. of Corrections, 79 F.3d

1024 (10th Cir. 1996), provides the analysis for determining whether Ms. Zinn is an

employee of the Department for purposes of Title VII.   In Lambertsen, we held that the

skeletal definitions of "employer" and "employee" provided in 42 U.S.C. § 2000e(b) and

(f) should be fleshed out by applying common-law agency principles to the facts and

circumstances surrounding the working relationship of the parties.  See id. at 1028.

Though the main focus of  Lambertsen's hybrid inquiry is whether and to what extent a

putative employer has the "right to control the 'means and manner' of the worker's

performance," id., other factors inform the analysis, including

> (1) the kind of occupation at issue, with reference to whether the work
> usually is done under the direction of a supervisor or is done by a specialist
> without supervision;  (2) the skill required in the particular occupation;  (3)
> whether the employer or the employee furnishes the equipment used and the
> place of work;  (4) the length of time the individual has worked;  (5) the
> method of payment, whether by time or  by job;  (6) the manner in which
> the work relationship is terminated;  (7) whether annual leave is afforded;
> (8) whether the work is an integral part of the business of the employer;  (9)
> whether the worker accumulates retirement benefits;  (10) whether the
> employer pays social security taxes;  and (11) the intention of the parties.

---

[3]Title VII defines "employee" as "an individual employed by an employer . . . ."
42 U.S.C. § 2000e(f).

7

Id. The Lambertsen calculus requires us to look to the totality of circumstances surrounding the working relationship between the parties; no single factor is determinative. See id.

Ms. Zinn urges that the district court incorrectly applied the Lambertsen test to the operative facts of this case, improperly construing the facts in the light most favorable to the Department and ignoring or misconstruing facts favorable to a finding that Ms. Zinn was an employee of the Department in its Lambertsen analysis. We disagree. The evidence Ms. Zinn presented to the district court, read in the light most favorable to her, could not support a finding by a reasonable jury that the Department controlled the means and manner of her work performance.

Apart from the issue of supervision and evaluation, it is uncontroverted that Ms. Zinn was an employee of PHS and received compensation and benefits from PHS, not the Department. See Swallows v. Barnes & Noble Book Stores, Inc., 128 F.3d 990, 992-93, 995 (6th Cir. 1997); Mares v. Marsh, 777 F.2d 1066, 1068 (5th Cir. 1985); II Joint App. at 505-08. PHS provided services to the Department as an independent contractor, and PHS employees, merely by fulfilling terms of the Department-PHS service contract, did not thereby become Department employees. Ms. Zinn suggests otherwise. Reviewing the summary judgment evidence as a whole, however, we believe it is apparent that is not the case. No evidence establishes the requisite degree of control over Ms. Zinn's professional nursing services necessary to support a finding that Ms. Zinn was an

8

employee of the Department.  Though some elements, in isolation and not in accordance with Lambertsen, might appear consistent with an employment relationship, no reasonable jury could find an employment relationship existed based on the totality of the circumstances, and summary judgment is thus proper.  See Oestman v. Nat'l Farmers Union Ins. Co., 958 F.2d 303, 306 (10th Cir. 1992).

First, in Lambertsen, we implicitly recognized that though valid penological measures imposed to ensure safety and security within a facility may require a worker to fulfill certain conditions, those conditions do not rise to the level of "control" for purposes of determining a worker's employment status with the correctional facility itself.  See Lambertsen, 79 F.3d at 1026, 1028 (holding that controlling ingress and egress of worker and requiring that worker abide by rules of conduct within facility is insufficient to establish employment relationship for Title VII purposes).  Much of the evidence Ms. Zinn cites in an attempt to establish the Department's control over the means and manner of her work performance reflects the Department's penological interest in ensuring security and safety within the facility.   For example, the memoranda upon which Ms. Zinn relies to establish Fritz Young's supervisory control over her relate to inmate access to the clinic, restocking of the first aid kits, maintaining a "sharps" inventory, and beginning sick call at a time when the facility is adequately staffed.  See II Joint App. at 365-68.  The Department's interest in controlling who and what goes into and out of the clinic and at what time clearly relates to the safety and security of the prison, as does its

9

interest in maintaining an accurate "sharps" inventory and adequate medical supplies throughout the prison. Similarly, Ms. Zinn's performance of on-site nursing duties using Department facilities and equipment serves the Department's interest in operating the correctional facility in a manner which ensures the safety and security of employees and inmates alike. Finally, the Department's interests in controlling Ms. Zinn's working hours and access to the facility serve these same purposes. Ms. Zinn's reliance on these factors is thus misplaced.

Moreover, many of the terms and conditions that Ms. Zinn relies upon were part and parcel of the agreement governing the relationship between the Department and PHS. The contract provides that PHS and its employees will be considered independent contractors by the Department and expressly denies the creation of an agency, employee or servant relationship with PHS or its employees, but requires all PHS personnel to abide by the Department's Employee Rules of Conduct. See I Joint App. at 75, 80. The contract also grants the Department the ability to control the format of documentation in medical records prepared by PHS personnel. See id. at 80. The Department's imposition of these requirements on PHS, its independent contractor, in order to facilitate the clinic's operation does not make Ms. Zinn, admittedly an employee of PHS, also an employee of the Department. The contract language simply indicates the parties intended the Department to retain control over its facility and, to that end, to a limited extent over PHS personnel. Thus, Ms. Zinn's reliance on the contract's provisions and the Department's

10

compliance with them proves nothing. See Mares, 777 F.2d at 1069.

We also reject Ms. Zinn's argument that the Department "reimburses" PHS for her salary, and thus the Department employs her, for similar reasons; the Department simply pays for the services provided by PHS personnel as provided in the contract, and it is PHS's responsibility to pay wages, salaries, and benefits to PHS personnel. See I Joint App. at 55, 69-70, 86-87; Lambertsen, 79 F.3d at 1026 (noting payment of salary and benefits by School District, not Utah Department of Corrections). Moreover, Ms. Zinn's contention that she was terminated by the Department is similarly refuted by the provisions of the contract. Though the Department retains the right to request removal of PHS personnel with whom it is dissatisfied, and did so in this case, PHS alone exercises control over the hiring and firing of PHS personnel, I Joint App. at 86, and actually offered Ms. Zinn work assignments in other facilities prior to placing her on disability leave. See Aplt. Br. at 9. Thus, though the contract allowed the Department to request that Ms. Zinn be transferred from the Osawatomie facility, the record is undisputed that PHS alone retained the ability to terminate Ms. Zinn, indicating the Department was not her employer. See Swallows, 128 F.3d at 995; Lambertsen, 79 F.3d at 1026, 1028.

Ms. Zinn also relies on evidence that Phyllis Warder, a Department employee, supervised her. However, though Ms. Warder supervised and evaluated Ms. Zinn's performance on a yearly basis, Ms. Warder was herself supervised and evaluated by PHS, not the Department. See I Joint App. at 92. Moreover, Ms. Warder was assigned to a

11

different facility than Ms. Zinn, and sometimes had as little contact as one telephone call per week with Ms. Zinn.  See II Joint App. at 327-28.  Thus, the evidence merely indicates that Ms. Warder oversaw Ms. Zinn's performance, not that she directed or controlled it on a daily basis.

Further, Ms. Zinn argues that since 1993 the Department's Employee Rules of Conduct have defined "employee" to include "any person employed by an entity under contract to provide services to the [Department,]" I Joint App. at 99, 124, and that this definition is evidence of the Department's intent to create an employment relationship with PHS personnel.  We disagree.  Tellingly, at the time of her deposition Ms. Zinn did not believe that she had an employment relationship with the Department.  See id. at 52.[4] Given that the contract itself clearly requires compliance with all internal policies and general orders of the Department, such as the Employee Rules of Conduct, and further evinces the clear understanding of the parties that an independent contractor relationship shall at all times exist, the definition relied upon by Ms. Zinn simply does not rise to the level of a disputed material fact.  The Department's definition of  "employee" does not evince an intent to create an employment relationship where none otherwise exists.

---

[4]Ms. Zinn testified in deposition:
Q: So that there is no misunderstanding, you understand that your employer was Prison Health Services, correct?
A: That was my employer.
Q: Kansas Department of Corrections was not your employer?
A: That's right.

Ms. Zinn also asserts that the sheer volume of reports filed by correctional officers relating to her operation of the clinic combined with the Department's acceptance and investigation of EEO reports she filed establish that the Department controlled her employment. We disagree. First, Ms. Zinn does not explain how the number of reports filed or the Department's investigation of her complaints are relevant under the Lambertsen analysis. Even were we to find these factors probative under Lambertsen, they do not in any way establish that the Department controlled Ms. Zinn's performance of her nursing duties. See Lambertsen, 79 F.3d at 1028; Wilde v. County of Kandiyohi, 15 F.3d 103, 106 (8th Cir. 1994).

Finally, Ms. Zinn argues that the services she provided to the Department were integral to the Department's business because the Department must provide adequate medical care to prisoners. See Estelle v. Gamble, 429 U.S. 97, 103 (1976). While Ms. Zinn's performance of a traditional government function as an employee of a private contractor is pertinent to other inquiries, see Richardson v. McKnight, 117 S. Ct. 2100 (1997) (addressing § 1983 liability and qualified immunity), we do not believe, considering the totality of the circumstances, that Ms. Zinn has proffered sufficient evidence to support a finding that she was an employee of the Department. The evidence presented by Ms. Zinn indicates that her relationship with the Department was defined by the terms of the PHS-Department contract and by the Department's valid interests in security and safety. In all other respects, PHS controlled the manner and means of her

13

work performance. This is not a case where an individual independent contractor claims to be an employee of an entity. See Garcia v. Copenhaver, Bell & Assocs., 104 F.3d 1256, 1266-67 (11th Cir. 1997). Rather, it is a case where an employee of one entity necessarily contends, despite her admission to the contrary, that she is also the employee of another. See supra note 4. The summary judgment evidence simply does not support this difficult position. Because Ms. Zinn has not presented evidence which would allow a reasonable jury to find for her on this issue, the district court properly granted summary judgment on Ms. Zinn's Title VII claims. See Jenkins v. Wood, 81 F.3d 988, 990 (10th Cir. 1996).

In the alternative, Ms. Zinn asserts that the Department acted as an agent of PHS and that even absent an agency or employment relationship Title VII provides protection against retaliation. See Aplt. Br. at 25-32. Our review of the record indicates Ms. Zinn did not raise these arguments before the district court in response to the Department's summary judgment motion and the district court had no opportunity to address them. See II Joint App. at 530-38, 590-95. Similarly, Ms. Zinn did not raise the joint employment or loaned servant theories below, and has not raised them before this court. See id.; cf. Concurring Opinion at 3-4. Absent "the most manifest error," which is not present here, we are not inclined to decide this case on theories not addressed by the parties nor considered by the district court. See Smith v. Northwest Fin. Acceptance, Inc., 129 F.3d 1408, 1415-16 (10th Cir. 1997); Telecommunications, Inc. v. Commissioner, 104 F.3d

14

1229, 1232 (10th Cir. 1997).

Ms. Zinn also suggests that the district court erred in dismissing her whistle-blower retaliation claim brought under Kansas state law. The district court held Ms. Zinn had not presented evidence of a clear and convincing nature establishing she was a Department employee, and thus failed to show that the Department had the power to terminate her employment. See Zinn, 949 F. Supp. at 1537-38. The district court also held Ms. Zinn failed to show the existence of a causal connection between her whistle-blowing and any retaliation against her. See id. at 1538; Palmer v. Brown, 752 P.2d 685, 690 (Kan. 1988); Ortega v. IBP, Inc., 874 P.2d 1188, 1192 (Kan. 1994). Although we are aware that the Kansas Supreme Court recently extended the doctrine of retaliatory discharge to include retaliatory demotion, see Brigham v. Dillon Companies, Inc., 935 P.2d 1054, 1059-60 (Kan. 1997), Ms. Zinn did not argue below and there is nothing in the record suggesting that the Department's actions resulted in a demotion, and we need not examine that theory here. See Telecommunications, Inc., 104 F.3d at 1232. Thus, after careful review of the record and authority controlling this matter, we affirm for substantially the same reasons given by the district court. See Zinn, 949 F. Supp at 1536-38.

AFFIRMED.

No. 97-3007, <u>Zinn v. McKune</u>

BRISCOE, Circuit Judge, concurring:

I concur in the result reached by the majority on Zinn's Title VII retaliation and state law whistleblowing claims, but disagree with the majority's conclusion that Zinn failed to establish Kansas Department of Corrections (KDOC) could be her employer for purposes of these Title VII and state law claims. Zinn has made a sufficient showing of a dual employer relationship to survive summary judgment. I would affirm the summary judgment on the Title VII claim on the ground that Zinn failed to establish she engaged in activity protected by Title VII. I would affirm the summary judgment on the whistleblowing claim on the ground that Zinn failed to establish she was fired in retaliation for reporting a serious violation of rules, regulations, or law.

An employer is prohibited from discriminating against an employee for opposing any practice made unlawful by Title VII or for charging, testifying, assisting, or participating in any manner in an investigation, proceeding, or hearing under Title VII. 42 U.S.C. § 2000e-3. The majority concludes Zinn cannot prevail on her retaliation claim because KDOC is not Zinn's employer. Zinn contends that although Prison Health Services (PHS) was her formal employer, KDOC was also her employer by virtue of the day-to-day control it exercised over her work at the prison clinic.

Because Title VII is a remedial statute, it must be interpreted liberally to effectuate its purpose of eradicating employment discrimination. <u>Berry v. Stevinson Chevrolet</u>, 74 F.3d 980, 985 (10th Cir. 1996); <u>see</u> <u>Robinson v. Shell Oil Co.</u>, 117 S. Ct. 843, 848-49

(1997). In the absence of clear congressional mandate, courts should avoid interpretations of Title VII that deprive discrimination victims of a remedy. See Berry, 74 F.3d at 988.

42 U.S.C. § 2000e(b) defines "employer" as "a person engaged in an industry affecting commerce who has fifteen or more employees" in a specified period, and § 2000e(f) defines "employee" as "an individual employed by an employer." "Industry affecting commerce" includes "any governmental industry, business, or activity." 42 U.S.C. § 2000e(h). The Supreme Court has broadly construed "employee" as used in § 2000e-3 to include both current and former employees. Robinson, 117 S. Ct. at 845; Berry, 74 F.3d at 985. The term "employer" under Title VII should also be "construed in a functional sense to encompass persons who are not employers in conventional terms, but who nevertheless control some aspect of an individual's compensation, terms, conditions, or privileges of employment." See Magnuson v. Peak Technical Services, Inc., 808 F. Supp. 500, 507-08 (E.D. Va. 1992).

The general test for determining whether a plaintiff has demonstrated an employer-employee relationship under Title VII is derived from the common law test for a master-servant relationship. See Lambertsen v. Utah Department of Corrections, 79 F.3d 1024, 1029 (10th Cir. 1996).

> [T]he main focus of the court's inquiry is the employer's right to control the "means and manner" of the worker's performance. However, the hybrid test also looks at other factors, including: (1) the kind of occupation at issue, with reference to whether the work usually is done under the

direction of a supervisor or is done by a specialist without supervision; (2) the skill required in the particular occupation; (3) whether the employer or the employee furnishes the equipment used and the place of work; (4) the length of time the individual has worked; (5) the method of payment, whether by time or by job; (6) the manner in which the work relationship is terminated; (7) whether annual leave is afforded; (8) whether the work is an integral part of the business of the employer; (9) whether the worker accumulates retirement benefits; (10) whether the employer pays social security taxes; and (11) the intention of the parties.  No single factor is conclusive.  Rather, the courts are to look at the totality of circumstances surrounding the working relationship between the parties.

Id. at 1028 (internal citations omitted).

In determining whether both KDOC and PHS were Zinn's employers, we must consider related common law doctrines under which a worker may be employed by more than one employer.  Generally, a person may be the employee of two employers, "at one time as to one act, if the service to one does not involve abandonment of the service to the other."  Restatement (Second) of Agency § 226 (1958).  Title VII case law recognizes that two separate entities may be a worker's employer if they share or codetermine matters governing the essential terms and conditions of the worker's employment.  When a worker is formally employed by one organization, but important aspects of his work are subject to control by another organization, both organizations are employers of the worker.  An independent entity with sufficient control over the terms and conditions of the employment of a worker formally employed by another is a joint employer within the scope of Title VII.  See, e.g., Graves v. Lowery, 117 F.3d 723, 727 (3d Cir. 1997); Virgo v. Riviera Beach Assocs., 30 F.3d 1350, 1360 (11th Cir. 1994).  Here, Zinn's work at the

KDOC facility did not involve abandonment of service to PHS. Her job with PHS was to provide health care services to inmates under KDOC's charge.

Similarly, under the loaned servant doctrine, a "servant directed or permitted by his master to perform services for another may become the servant of such other in performing the services. He may become the other's servant as to some acts and not as to others." Restatement (Second) of Agency § 227. Title VII case law recognizes that under the loaned servant doctrine, a worker formally employed by a temporary employment agency and assigned to work under the control and supervision of a client of the agency is an employee of both the agency and the client. See Amarnare v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 611 F. Supp. 344, 349 (S.D. N.Y. 1984), *aff'd* 770 F.2d 157 (2d Cir. 1985).

There is evidence in the record that PHS and KDOC split the right to control Zinn's work. KDOC had the right to control how Zinn performed the security aspects of her job while PHS had the right to control the nursing aspects of her work. Conversely, PHS had no right to control the security aspects and KDOC had no right to control the nursing aspects. Zinn was not just a nurse, but a nurse in charge of a clinic for prison inmates. She was specifically hired for that position. At least one of the people who interviewed her for the job was a KDOC employee. Zinn's work required her to have very close contact with inmates, often with no one else present, and there were special security concerns because there were sharp instruments and drugs at the clinic. All PHS

-4-

employees were required to undergo training by KDOC and to follow KDOC policies and procedures. The contract between KDOC and PHS gave KDOC a means of enforcing control over Zinn by requiring PHS to remove Zinn at KDOC's request. Employees of contractors were expressly treated as KDOC employees in KDOC's manual of internal management policy and procedure. As evidence of that fact, KDOC acted on Zinn's internal EEO complaint as though she were its employee.

There is evidence in the record that KDOC exercised its right of control over the security aspects of Zinn's work. In answer to interrogatories, PHS stated Zinn was supervised in delivering health care to inmates by a KDOC employee who reported to a PHS employee. However, KDOC administrator Young "would supervise Ms. Zinn and her management of the medical clinic as it would relate to the interrelationship between managing the medical clinic within the confines of a correctional facility." App. at 360. Zinn needed permission from Young to leave work early, and Young had directed her to inform him if she worked outside her regular hours. He set the time for her to start sick call, and required her to complete clinic inventories by a certain date each month. He directed her to complete an incident report when an inmate was hurt, and directed her to allow inmates in the clinic only for medical reasons or for work assignments.

I conclude from this evidence that whether KDOC was Zinn's employer is a question of fact. In Lambertsen, a teacher hired and paid by a school district and assigned to work in a state prison education program brought a Title VII action against the

department of corrections after she was sexually assaulted by an inmate. This court

concluded the department of corrections was not plaintiff's employer under Title VII.

> Although the Department physically controlled plaintiff's entry into the Correctional Facility and provided security for plaintiff . . ., the uncontroverted evidence indicates that plaintiff's employer was the School District. *Most notably, there is simply no evidence in the record from which a finder of fact could conclude the Department controlled the means or the manner in which plaintiff performed her day-to-day work.* Rather, the uncontroverted evidence makes clear that the major terms of plaintiff's employment (e.g., work assignments, pay, etc.) were controlled solely by the School District.

79 F.3d at 1028-29 (emphasis added). Here, however, there was evidence in the record

that KDOC controlled the means and manner in which Zinn performed her work as the

nurse in charge of a prison clinic.

Recognition that the control exercised by KDOC over Zinn's work could make

KDOC her employer is consistent with Title VII's remedial purpose of eradicating

employment discrimination. An organization whose employees are in a position to

discriminate against a worker who is performing work under that organization's control

should be recognized as that worker's employer under Title VII, whether or not the

organization is the worker's formal employer. In a case like this one where a worker's

formal employer assigned her to work for a separate organization, employees of both the

formal employer and the separate organization are in a position to discriminate against the

worker with respect to her employment.

Although Zinn presented evidence that KDOC was her employer, she did not

present evidence supporting her retaliation claim. To establish a prima facie case of retaliation, she must prove (1) she engaged in protected opposition to discrimination; (2) adverse action by the employer subsequent to the protected activity; and (3) a causal connection between the employer's activity and the adverse action. Sauers v. Salt Lake County, 1 F.3d 1122, 1128 (10th Cir. 1993). Zinn contended KDOC retaliated against her after she filed an internal EEO complaint with KDOC. However, she failed to establish this complaint was protected activity. Although the complaint that triggers the retaliation need not ultimately be upheld, see Archuleta v. Colorado Dept. of Institutions, 936 F.2d 483, 487 (10th Cir. 1991), the plaintiff must have had a reasonable good faith belief that defendant was engaging in discrimination. E.g., Dey v. Colt Constr. & Development Co., 28 F.3d 1446, 1457 (7th Cir. 1994); Rettiger v. IBP, Inc., 980 F. Supp. 1182, 1190 (D. Kan. 1997).

Zinn failed to establish that her EEO complaint alleged discrimination forbidden by Title VII. In her complaint, she did not expressly allege any discrimination on the basis of sex. She characterized her complaint as one for retaliation, but did not specify the retaliation was for complaining or opposing discrimination prohibited by Title VII. She reported incidents of "harassment" by KDOC employees, but did not complain that the harassment was sexual or was otherwise discriminatory. Most of the incidents reported were personality clashes or disagreements over prison policies. Nor did she report the harassment was in retaliation for prior opposition or complaints about

-7-

discrimination. Only one of the reported incidents, the spreading of a rumor of a sexual relationship with an inmate, could be characterized as sexual harassment. However, that alone could not create a sexually hostile work environment and, in any case, sexual harassment was not the basis for her complaint. Because she could not have had a reasonable good faith belief that she was reporting retaliation or discrimination prohibited by Title VII, she did not establish that she engaged in protected activity by filing the internal EEO complaint with KDOC.

Zinn also raised a state law claim that KDOC caused her employment discharge in retaliation for reporting misuse of state property by a KDOC administrator. The district court rejected this whistleblower claim, ruling KDOC was not Zinn's employer under state law. Kansas law recognizes that under Restatement (Second) of Agency §§ 226 and 227 an employee may be simultaneously employed by more than one employer. Bright v. Cargill, Inc., 837 P.2d 348, 362-63 (Kan. 1992). The evidence that KDOC could be Zinn's employer under Title VII is also sufficient to support her state law retaliatory discharge claim on summary judgment. KDOC had the right to control security aspects of Zinn's work and exercised that control. Although KDOC did not have the right to discharge Zinn from her employment with PHS, it did have the right to demand her reassignment and it exercised control over how she performed her job. However, summary judgment was appropriate because to establish a whistleblowing claim, a plaintiff must prove, among other things, that he or she reported "a serious infraction" of

rules, regulations, or law pertaining to public health, safety, and general welfare by coworkers to company management or law enforcement officials. <u>See</u> <u>Palmer v. Brown</u>, 752 P.2d 685, 689-90 (Kan. 1988). Zinn reported that KDOC administrator Young allowed a departing employee to take state property--a bulletin board made by an inmate from state owned materials which had been personalized for the employee. This is not the kind of serious infraction recognized in <u>Palmer</u> as a basis for a whistleblowing claim.

I would conclude Zinn was an employee of both PHS and KDOC for purposes of Title VII and related state law claims. I concur in affirming the district court's grant of summary judgment as Zinn's claims fail on their merits.